**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PRISONERS' LEGAL SERVICES OF NEW YORK, *et al.*,

Plaintiffs,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

Defendants.

25 Civ. 1965 (GHW) (VF)

# DEFENDANTS' OBJECTIONS TO REPORT AND RECOMMENDATION

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2695

PIERRE G. ARMAND
REBECCA L. SALK
Assistant United States Attorneys
- Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................1

BACKGROUND ....................3

A. The BFDF Mail Inspection Policy ....................3

B. The Complaint and the Government's Motion to transfer Venue ....................8

C. The Report and Recommendation ....................9

ARGUMENT ....................10

I. Standards of Review ....................10

II. The Court Should Consider the Government's Pending Motion to Transfer Before Addressing Plaintiff's motion for a Preliminary Injunction ....................11

III. The Court, Alternatively, Should Deny Plaintiffs' Motion for a Preliminary Injunction ....................14

A. The R&R Incorrectly Concluded That Plaintiffs Are Substantially Likely to Succeed on the Merits ....................14

B. The R&R Incorrectly Concluded That Plaintiffs Made a Strong Showing of Irreparable Harm ....................21

C. The R&R Incorrectly Concluded That the Balance of Hardships and Public Interest Weigh in Favor of Granting a Preliminary Injunction ....................23

CONCLUSION ....................24

## TABLE OF AUTHORITIES

***Cases***

*Adrianza v. Trump*,
505 F. Supp. 3d 164 (E.D.N.Y. 2020)…………………………………………………...13

*Arrowsmith v. United Press Intern.*,
320 F.2d 219 (2d Cir. 1963)........................................................................................ 14

*Beard v. Banks*,
548 U.S. 521 (2006)..................................................................................................... 18

*Bray v. Mazza*,
No. 4:21-CV-00119-JHM, 2022 WL 17836601 (W.D. Ky. Dec. 21, 2022)...................... 15, 18

*Cerussi v. Union College*,
144 F. Supp. 2d 265 (S.D.N.Y. 2001)........................................................................... 12

*Christmas v. Nabors*,
76 F.4th 1320 (11th Cir. 2023) .................................................................................... 16

*Davis v. Goord*,
320 F.3d 346 (2d Cir. 2003)........................................................................................ 21

*Davis v. Pension Benefit Guaranty Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) ................................................................................... 24

*Gold v. Scurlock*,
290 F. Supp. 926 (S.D.N.Y. 1968)............................................................................... 13

*Grand River Enter Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007).......................................................................................... 11

*Hanly v. Powell Goldstein, L.L.P.*,
290 F. App'x 435 (2d Cir. 2008) ............................................................................ 13, 14

*Hanover v. Zapata Corp.*,
No. 72-CV-2025 (IBW), 1973 WL 376 (S.D.N.Y. Mar. 16, 1973)............................... 14

*Harry Winston, Inc. v. Zale Jewelry Co.*,
191 F. Supp. 686 (S.D.N.Y. 1961)............................................................................... 13

*Hester v. French*,
985 F.3d 165 (2d Cir. 2021)........................................................................................ 12

*Huminski v. Rutland City Police Dep't*,
221 F.3d 357 (2d Cir. 2000) .......... 24

*Kern v. Clark*,
331 F.3d 9 (2d Cir. 2003) .......... 17

*Levine v. Bradshaw*,
No. 22-80321-CIV, 2023 WL 11885182 (S.D. Fla. July 6, 2023) .......... passim

*Moog Inc. v. Skyryse, Inc.*,
No. 22. Civ. 187 (LJV) (JJM), 2022 WL 17720965 (W.D.N.Y. Dec. 15, 2022) .......... 13

*Pesci v. Budz*,
935 F.3d 1159 (11th Cir. 2019) .......... 19

*Rodriguez v. Burnside*,
38 F.4th 1324 (11th Cir. 2022) .......... 17, 19

*Saltzberg v. TM Sterling/Austin Assocs., Ltd.*,
746 F. Supp. 1225 (S.D.N.Y. 1990) .......... 13

*Shaw v. Murphy*,
532 U.S. 223 (2001) .......... 18

*Students for Fair Admissions v. U.S. Military Academy at West Point*,
709 F. Supp. 3d 118 (S.D.N.Y. 2024) .......... 11

*Thomas v. Arn*,
474 U.S. 140 (1985) .......... 11

*Turner v. Safley*,
482 U.S. 78 (1987) .......... 12, 22

*Walker v. Little*,
No. 20 Civ. 4460, 2022 WL 580641 (E.D. Pa. Feb. 24, 2022) .......... 16

*Yang v. Kosinski*,
960 F.3d 119 (2d Cir. 2020) .......... 12

***Statutes***

28 U.S.C. § 636(b)(1) .......... 12

28 U.S.C. § 636(b)(1)(C) .......... 12

***Rules***

Fed. R. Civ. P. 25(d) ........................................................................................................................ 1

Defendants the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), DHS Secretary Kristi Noem, ICE Enforcement and Removal Operations ("ERO") Buffalo Deputy Field Office Director Joseph E. Freden, and Acting ICE ERO Buffalo Field Office Director Stephen Kurzdorfer,[1] in their official capacities (collectively, the "Defendants" or "Government"), respectfully submit this Objection to the August 5, 2025 Report and Recommendation (the "R&R") of Magistrate Judge Valerie Figueredo (ECF No. 59).

**PRELIMINARY STATEMENT**

In response to concerns that documents tainted with drugs and other synthetic substances were entering the facility through legal mail and endangering the health and safety of detainees and staff, the Buffalo Federal Detention Facility ("BFDF"), located in Batavia, New York, implemented a mail inspection policy in November 2024. This policy—which BFDF previously implemented for the same reason between November 2023 and March 2024, in slightly different form—involves the following process, all of which must occur in the detainee's presence: BFDF staff open and photocopy all incoming detainee legal mail, give the copy to the detainee, and deposit the original in the detainee's property bin, which is secured with a numbered and documented seal. Notably, BFDF staff is prohibited from reading originals or copies of detainee legal mail or opening detainee property bins outside of the detainee's presence.

Plaintiffs—legal services organizations who represent individuals detained at BFDF—filed this action in March 2025, alleging that the policy violates the First Amendment by chilling their free speech rights and violates the Administrative Procedure Act ("APA"). In April 2025, Defendants filed a motion to transfer this action to the Western District of New York ("WDNY"),

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Stephen Kurzdorfer is automatically substituted for former ICE Enforcement and Removal Operations Buffalo Field Office Director Thomas Brophy as a defendant in this action.

and in May 2025, Plaintiffs filed a motion for a preliminary injunction in which they asked this Court to return the parties to the status quo as it existed prior to November 2023.

On August 5, 2025, Magistrate Judge Figueredo issued the R&R, declining to address the transfer motion and recommending that the Court issue a preliminary injunction that effectively restores the status quo as it existed between March and November 2024, when BFDF relied on an electronic scanner to inspect legal mail and followed the procedure described above when drugs or other foreign substances were detected. In particular, the R&R determined that Plaintiffs had a strong likelihood of demonstrating that BFDF's practice of retaining detainees' original legal mail in property bins violated the First Amendment.

Defendants respectfully object to the R&R for two principal reasons. First, the R&R's conclusion that the Court should consider the merits of Plaintiffs' preliminary injunction motion before addressing the pending transfer motion flies in the face of established precedent in this Circuit that important factual and legal issues should not be adjudicated by a transferring court, but by the court that will have responsibility for ultimately deciding the case. That is particularly true here, as the facts and circumstances giving rise to this action arose in the WDNY, where BFDF is located.

Second, the R&R's conclusion that Plaintiffs have discharged their heavy burden to establish entitlement to the extraordinary and drastic remedy of a preliminary injunction is flawed. Plaintiffs cannot establish any likelihood of success on the merits because they cannot identify a single case in which a court invalidated a mail inspection policy similar to the policy challenged here. To the contrary, the Government has identified cases where similar policies have been upheld. Moreover, BFDF's decision to secure all original legal mail in property bins, as opposed to only mail that the scanner identifies as containing contraband, is entirely reasonable given that

the scanner is not 100% effective at detecting contraband. Moreover, destroying all original legal mail other than that which the scanner identifies as containing contraband, instead of securing it in detainee property bins, would deprive detainees of important original documents they may need for their cases. Conversely, Plaintiffs offer no reliable evidence to support their asserted risk that BFDF staff will access detainee property bins and read original legal mail in violation of the policy.

Furthermore, Plaintiffs' assertions of actual injury are speculative, and their long delay in seeking injunctive relief undermines their claim that they will be irreparably harmed absent an injunction. Nor do the balance of equities and public interest favor injunctive relief in light of the health and safety concerns motivating the BFDF mail policy.

Thus, the Court should (1) stay consideration of the preliminary injunction motion and rule on the motion to transfer venue, or alternatively, (2) deny the preliminary injunction motion.

## BACKGROUND

### A. The BFDF Mail Inspection Policy

The BFDF is an ICE-owned Service Processing Center located in Batavia, New York. Declaration of George P. Harvey Jr., dated June 10, 2025 ("Harvey Decl.") (ECF No. 46) ¶ 5. It is run by the ICE ERO Buffalo Field Office. *Id.* In November 2023, BFDF was faced with "an emergency situation regarding drugs and synthetic substances being sent to the detained population via the U.S. mail service, involving mail marked as legal mail and non-legal mail." *Id.* ¶ 8. "ERO Buffalo Officers determined through investigative means that detainees were receiving envelopes and papers in the mail that were soaked or sprayed with drugs and/or synthetic substances." *Id.* This resulted in hospitalizations of detained individuals, suspected overdoses, and complaints from BFDF staff concerning the "unsafe work environment" created by the contraband. *Id.* In response to this situation, on November 13, 2023, ERO Buffalo leadership implemented a temporary policy pursuant to which "all special correspondence, including legal mail, was required to be opened

and photocopied in front of the detainee to whom it was addressed, and the originals were to be sealed in the original envelope and placed into the detainee's property bin." Id. ¶¶ 9, 10 & Ex. A.

The BFDF, like all ICE-owned detention facilities, is subject to the 2011 ICE Performance-Based National Detention Standards with 2016 Revisions ("PBNDS"). See id. ¶¶ 7, 11. In general, the PBNDS provides for the treatment of legal mail as "privileged." *See* PBNDS § 5.1(V)(C)(4); Plaintiffs Mem. of Law in Support of Mot. for Prelim. Injunction (ECF No. 36) ("Pls. 'PI Br.") at 3-4. However, PBNDS § 5.1(V)(F)(2) also provides that "[a]ll facilities shall implement procedures for inspecting for contraband, in the presence of the detainee, all special correspondence or legal mail." Harvey Decl. ¶ 11. Pursuant to this provision, "[d]etainees shall sign a logbook upon receipt of special correspondence and/or legal mail to verify that the special correspondence or legal mail was opened in their presence." *Id.* Inspections "shall be limited to the purposes of detecting physical contraband and confirming that any enclosures qualify as special correspondence or legal mail." *Id.* Moreover, the provision specifies that "[s]taff shall neither read nor copy special correspondence or legal mail." *Id.* In light of these provisions, on November 15, 2023, ICE ERO Headquarters approved a 90-day waiver of these PBNDS provisions "to allow the opening and photocopying of all legal mail and special correspondence received at the BFDF and placing the originals in the detainee's property." *Id.* ¶ 12 & Ex. B.

An updated memorandum reflecting the policy was provided to BFDF staff on November 15, 2023. *Id.* ¶ 13 & Ex. C. Under the November 2023 policy, in addition to opening all legal correspondence in front of the detainee to whom it belonged and providing the detainee with a copy of the mail, *see id.* ¶ 13, the original legal correspondence would be placed in the detainee's property bin, which would then be resealed, with the new seal documented, *see id.* ¶ 14; Ex. C. Each time a detainee's property bin is opened and new items are added to it, the bin is resealed and

a new seal is documented. *Id.* ¶ 14. The policy further provides that "[t]he distribution of all 'Special Correspondence,' including 'Legal Mail,' w[ould] be conducted in the Processing Unit." *Id.* Ex. C. This practice is consistent with section 2.5 of the PBNDS: detainee property bins must be sealed in a tamper resistant manner, may be opened only in the presence of the detainee, and must be recorded in a logbook.[2] The November 2023 policy generally was not applied to outgoing legal mail. *Id.* ¶ 15.

The policy also afforded detainees the ability to retrieve original legal documents from property bins where necessary. Harvey Decl. ¶ 25. Specifically, on November 10, 2023, BFDF Assistant Field Office Director Peter N. Sukmanowski, sent an email to Sarah Gillman, the Director of Strategic U.S. Litigation at Robert F. Kennedy Human Rights, concerning the November 2023 policy explaining that "[s]hould an attorney or court require an original be given to a detainee for special circumstances (i.e. – a signature, raised seal, etc.), that can be arranged in coordination with their deportation officer via the duty officer inbox (BTV-dutyofficer@ice.dhs.gov)." Declaration of Tyler Jankaukas ("Jankaukas Decl.") (ECF No. 41), Ex. 2.

After implementing this policy, BFDF detected "a decrease in drug and synthetic substance related incidents." Harvey Decl ¶ 17. In January 2024, ICE ERO Headquarters approved a further 90-day extension of the PBNDS waiver. *See id.* ¶ 18 & Ex. D.

In February 2024, BFDF received an electronic device, similar to an x-ray machine, that can be used to scan mail for drugs and synthetic substances. *Id.* ¶ 19. Relevant staff involved in

---

[2] *See* PBNDS § 2.5 V.I. ("All detainee … facility containers used for storing detainee personal property shall be secured in a tamper-resistant manner and shall only be opened in the presence of the detainee. After being properly inventoried and inspected for contraband, all … facility containers shall be tagged and stored securely."); *Id.* ("All … Facility containers used for storing detainee personal property shall be secured in a tamper resistant manner (*e.g.*, by a tamper-proof numbered tie strap) and shall only be opened in the presence of the detainee."); *Id.* ("A logbook shall be maintained listing detainee name, A-number or facility detainee number, I-77 number, security tie strap number, property description, date issued, and date returned.") (available at: https://www.ice.gov/detain/detention-management) (last visited August 21,2025).

processing detainee mail—typically contractors employed by Akima Global Services, LLC ("AGS"), *see id.* ¶ 13 n.1—were trained on the use of the scanner, and beginning in March 2024, staff began transitioning to use of the mail scanner in place of the policy described above, *id.* ¶ 20.

In May 2024, ICE ERO Headquarters approved a waiver for BFDF permitting the opening and photocopying of legal mail for an indefinite period of time. *Id.* ¶ 21, Ex. E. The memorandum requesting this waiver acknowledged BFDF's receipt of the scanner, explaining that while the scanner "provides the BFDF with a less intrusive means to police the introduction of these dangerous materials[,] …it is not 100% failsafe" and thus "[t]o ensu[r]e both the safety and security of all noncitizens, staff and visitors of the BFDF, while also not taking away the noncitizen's right to legal materials, some photocopying of documents that detect a foreign substance will be necessary." Harvey Decl. ¶ 21, Ex. E.

That same month, ERO Buffalo updated BFDF Policy 5.4.1 to reflect that AGS staff "were required to utilize the scanning device to scan legal mail and special correspondence to detect if it contained any foreign substance." *Id.* ¶ 22, Ex. F. The updated policy explained that, if correspondence needed to be opened and separated into smaller quantities for the scanner to work properly (if an envelope had more than 25 pages), this would be done in front of the detainee. *See id.* It further provided that "[i]f a foreign substance is detected, the mail clerk will make a photocopy of the documents and provide them to the detainee. The original documents will be sealed into an envelope and the detainee will write his name across the seal of the envelope. The mail will be placed into the detainee's property bin. The detainee will remain present during this process, and all scanning, copying and placement into his property will take place in front of him. At no time will an officer read any legal correspondence." *Id.*

In or around November 2024, BFDF detected another increase in drug and synthetic substance related incidents within the facility. *Id.* ¶ 23. In addition, medical staff complained about the air quality within the facility and how it gave them headaches and made them feel dizzy and nauseous. *Id.* According to the staff, the odor resembled the smell of chemicals. *Id.*

Around this time, ERO Buffalo Officers also determined that drugs or synthetic substances had entered the detained population through documents exchanged during court. Harvey Decl. ¶ 23. Consequently, on November 27, 2024, ERO Buffalo implemented a new policy concerning Detainee Visitation. *Id.* ¶ 24 & Ex. G. The policy provides "that if a legal representative provides documents to a detainee during a visit or in court, the documents must be placed in a sealed envelope and given to AGS staff to be delivered to the Processing Unit, where the documents will be processed as legal mail or special correspondence." *Id.* ¶ 24. The policy prohibits BFDF staff from reading such correspondence. *Id.*

Further, at or around the same time, to address this emergency situation, ERO Buffalo re-implemented the November 2023 policy providing for the inspection, opening, and copying of legal mail in front of detainees, and storage of original correspondence in the detainee's property bin. *Id.* Because ICE ERO Headquarters had already provided the necessary waiver, ERO Buffalo was able to implement these policy changes on its own to "ensure a safe and secure detention environment for BFDF staff and detainees that is free from drugs and dangerous substances." *Id.* The new policy went into effect on or about December 2, 2024. *Id.*

BFDF's Mail policy is not unique, as other detention and correctional facilities have also addressed the problem of drugs entering their facilities by photocopying legal mail. *Id.*, Ex H (Buffalo News article dated January 28, 2024 reflecting that the Erie County, New York Sheriff's Office has been photocopying legal paperwork in response to lawyers unwittingly giving their clients

documents laced with synthetic drugs); *id.,* Ex I (Albany, New York Times Union Article dated March 18, 2025 detailing a criminal case in which the defendant admitted to lacing copy paper and business envelopes with synthetic marijuana and sending the documents to state correctional facilities disguised as legal mail in the names of actual attorneys, and noting that the use of "legal mail" to smuggle drugs into state prisons has been "prevalent").

**B. The Complaint and the Government's Motion to Transfer Venue**

Plaintiffs filed this action on March 10, 2025—nearly four months after implementation of the current version of the mail policy at BFDF. *See generally* Compl. (ECF No. 1). They allege that the policy violates their First Amendment right to privileged and confidential communications with their clients at BFDF, *see id.* ¶¶ 39-42, and that the policy violated the APA because it does not comply with the PBNDS's provisions concerning legal mail, *see id.* ¶¶ 43-45.

On March 11, 2025, this Court entered an order directing Plaintiffs to show cause (the "OSC") "why this action should not be transferred to the Western District of New York [,]" noting that "[t]his entire case . . . arises from alleged conduct at the [BFDF] in Genesee County, which lies in the [WDNY]." (ECF No. 8). Plaintiffs responded to the OSC on April 4, 2025. ( ECF Nos. 21-24). In an order dated April 6, 2025, the Court indicated that it would take no further action on the OSC at that time, noting that "the Court has not determined that this case should not be transferred to the [WDNY]" but that it "decline[d] to do so now on its own initiative[,]" and that it would "consider any motion to transfer brought by a defendant in this case separately." (ECF No. 25). The Government filed a motion to transfer venue to the WDNY on April 28, 2025, which is fully submitted. (ECF Nos. 31-33).

Months after filing the complaint, on May 27, 2025, Plaintiffs filed the instant motion for preliminary relief. *See* Notice of Motion (ECF No. 34). They seek an order enjoining Defendants

"from reading, copying, or retaining for more than 48 hours (including retention in a detained person's property bin) any incoming or outgoing confidential legal documents, including both legal documents transmitted by mail or in-person, to or from persons detained in the Buffalo Federal Detention Facility." Proposed Order (ECF No. 35) at 2.

Plaintiffs do not allege in their complaint or preliminary injunction application any specific incident in which BFDF staff read or otherwise improperly handled a detainee's legal mail. Had they done so, ERO Buffalo would have investigated the alleged incident. Harvey Decl. ¶ 28. In support of their motion, Plaintiffs submit declarations from two attorneys who do not purport to have personal knowledge about the operation of the BFDF mail inspection policy, yet broadly claim that BFDF staff handle, inspect, copy, and retain detainees' legal mail outside of their presence, and that they stopped communicating in writing with an unspecified number of unidentified clients detained at BFDF out of concern that BFDF staff may read such legal mail. (ECF Nos. 38, 40). The only evidence Plaintiffs submit from someone purporting to have personal knowledge concerning the operation of BFDF's mail inspection policy is a declaration from Oswaldo Hodge Valdez, a PLSNY client detained at BFDF who does not claim that BFDF staff improperly accessed his property bin or read any of his legal mail. (ECF No. 39).

**C. The Report and Recommendation**

On August 5, 2025, Magistrate Judge Valerie Figueredo issued the R&R recommending that the Court issue a preliminary injunction. (ECF No. 59). The R&R declined to consider the pending motion to transfer venue, concluding that the preliminary injunction motion was ripe for adjudication now. R&R at 14. The R&R found that Plaintiffs sought a mandatory injunction requiring BFDF to implement the mail policy in place prior to November 2023. *Id.* at 35-40. The R&R declined to consider Plaintiffs' allegations that BFDF staff improperly read detainee legal

mail, as these are disputed facts, and instead addressed only the undisputed fact that, under the BFDF mail policy, all detainee original legal mail is secured in property bins. *Id.* at 27-28. The R&R concluded that Plaintiffs were substantially likely to succeed on the merits of their claim that this practice violated the First Amendment, and derivatively their APA claim. *Id.* At 15-27. The R&R found that Plaintiffs consequently made a strong showing of irreparable harm, that the balance of harms favors Plaintiffs, and that a preliminary injunction was in the public interest. *Id.* at 27-33. The R&R determined that "the least intrusive injunction would return the parties to the status quo as it existed between May and November 2024," and recommended that the Court issue a preliminary injunction: (1) "barring Defendants from opening legal mail outside of a detainee's presence," (2) "barring Defendants from retaining the original legal mail or a copy of that mail where no contraband is detected," and (3) "permitt[ing Defendants] to extend the mail policy they had in place between May 2024 and November 2024 to legal mail received during court appearances, so long as any inspection or copying of that legal mail is done in the detainee's presence and BFDF does not retain the original or a copy of the legal mail unless contraband is discovered. " R&R at 39, 40.

**ARGUMENT**

**I. Standards of Review**

The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations" of a magistrate judge. 28 U.S.C. § 636(b)(1) (C). Pursuant to 28 U.S.C. § 636(b)(1)(C), "[a] judge of the court shall make a *de novo* determination of those portions of the [Magistrate Judge's R&R] specified proposed findings or recommendations to which objection is made." *See Thomas v. Arn*, 474 U.S. 140, 142 (1985) (party who files objections obtains *de novo* review by district court).

"A preliminary injunction 'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Students for Fair Admissions v. U.S. Military Academy at West Point*, 709 F. Supp. 3d 118, 129 (S.D.N.Y. 2024) (quoting *Grand River Enter Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). A movant must clearly demonstrate: "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, [] (3) public interest weighing in favor of granting the injunction[,]" and (4) "that the balance of equities tips in his or her favor." *A.H. by & through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (quotation marks and footnotes omitted).

That standard is heightened even further where, as here, the movant seeks "to modify the status quo by virtue of a 'mandatory preliminary injunction' (as opposed to seeking a 'prohibitory preliminary injunction to maintain the status quo)[,]" the "standard for obtaining preliminary injunctive relief is higher." *Id.* (quoting *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020)). "In this circumstance, the movant must . . . make a *strong* showing of irreparable harm and demonstrate a *clear or substantial* likelihood of success on the merits." *Id.* (emphasis added; quotation marks omitted).

The Government agrees with the R&R's conclusion that Plaintiffs seek a mandatory injunction and that their application for injunctive relief should be held to the heightened standard, as granting their motion would require BFDF to adopt a mail inspection policy that has not been in place since before November 2023, more than 20 months ago.

## II. The Court Should Consider the Government's Pending Motion to Transfer Before Addressing Plaintiffs' Motion for a Preliminary Injunction

The Government respectfully objects to the R&R's recommendation that the Court consider the merits of Plaintiffs' motion for a preliminary injunction prior to addressing the

Government's pending motion to transfer this action to the WDNY because this conclusion is contrary to established law in this circuit and incorrectly relies on non-precedential authority.

Courts in the Second Circuit have declined to rule on substantive motions, including requests for preliminary injunctions, where, as here, transfer is proper. *See, e.g.*, *Cerussi v. Union College*, 144 F. Supp. 2d 265, 271 (S.D.N.Y. 2001) ("Having so ruled [that defendants' motion to transfer is granted], this Court will not resolve plaintiff's motion for a preliminary injunction."); *Moog Inc. v. Skyryse, Inc.*, No. 22. Civ. 187 (LJV) (JJM), 2022 WL 17720965, at *9 (W.D.N.Y. Dec. 15, 2022) (noting that there was "good reason not to" consider the preliminary injunction motion before addressing jurisdiction and venue); *Adrianza v. Trump*, 505 F. Supp. 3d 164, 173 (E.D.N.Y. 2020), *opinion vacated on other grounds, Adrianza v. Trump*, No. 20-4165, 2021 WL 10140434 (2d Cir. Oct. 13, 2021) ("When defendants object to venue, a district court must address venue before it can decide the merits of a motion for a preliminary injunction."); *Harry Winston, Inc. v. Zale Jewelry Co.*, 191 F. Supp. 686, 690 (S.D.N.Y. 1961) ("In view of the disposition of the defendant's transfer motion, it is not necessary for this Court to adjudicate plaintiff's preliminary injunction motion."); *see also Saltzberg v. TM Sterling/Austin Assocs., Ltd.*, 746 F. Supp. 1225, 1227-28 (S.D.N.Y. 1990) (finding it "right to defer to the transferee court" with respect to defendant's motion to dismiss); *Gold v. Scurlock*, 290 F. Supp. 926, 929 (S.D.N.Y. 1968) ("[A]n important element in the litigation, such as a motion for summary judgment, should not be decided by the transferor court, but should be adjudicated by the court that has the responsibility for ultimately deciding the case.").

In reaching the opposite conclusion, the R&R relies on non-binding cases that do not control here. *See* R&R at 13-14 (citing unpublished cases and cases outside of the Second Circuit). First, the R&R points to an unpublished district court opinion from 1973, in which the

district court merely noted that the Second Circuit had directed consideration of a pending preliminary injunction motion before the pending motion to transfer. *Id.* (citing *Hanover v. Zapata Corp.*, No. 72-CV-2025 (IBW), 1973 WL 376, at *1 (S.D.N.Y. Mar. 16, 1973)). However, the Government has been unable to find a published version of the Second Circuit's order referenced in *Hanover*, which suggests that it is therefore not precedential. Likewise, the Report's reliance on *Hanly v. Powell Goldstein, L.L.P.*, a non-binding Second Circuit summary order, is also misplaced. *See* R&R at 13 (citing *Hanly v. Powell Goldstein, L.L.P.*, 290 F. App'x 435, 438 n.2 (2d Cir. 2008)). There, the Second Circuit noted that "venue is not a jurisdictional issue" and thus, declined to address venue before turning to the merits. *Hanly*, 290 F. App'x 435, 438 n.2. This statement, however, is *dicta*, and directly contradicts binding Second Circuit authority holding that the "issue of venue" should be considered "prior to consideration of the merits." *Arrowsmith v. United Press Intern.*, 320 F.2d 219, 221 (2d Cir. 1963) (Friendly, J.) (vacating the district court's judgment where court failed to consider arguments on jurisdiction and venue).

The government also notes that it believes it has a particularly strong transfer motion here given that the BFDF is located in the WDNY, the facts and circumstances on which Plaintiffs' claims are based arise there, any injury to Plaintiffs occurred there, and most of the witnesses and evidence will be located there. (ECF Nos. 31, 33). While two of the three Plaintiffs have offices located in this District, they represent clients in the WDNY, and two Plaintiffs even litigated a habeas case in the WDNY raising claims regarding the same mail policy. (ECF No. 33 at 8, 9).

Accordingly, the Court should reject the R&R's finding that a preliminary injunction is appropriate and stay the preliminary injunction motion until the transfer motion is decided.

## III. The Court, Alternatively, Should Deny Plaintiffs' Motion for a Preliminary Injunction

The Government respectfully objects to the R&R's recommendation that the Court issue a preliminary injunction because, as explained below, Plaintiffs do not come close to demonstrating entitlement to such extreme relief under either preliminary injunction standard.

### A. The R&R Incorrectly Concluded That Plaintiffs Are Substantially Likely to Succeed on the Merits

Contrary to the R&R's conclusion, Plaintiffs failed to demonstrate a likelihood of success on the merits of their claim that the BFDF mail inspection policy violates the First Amendment.[3] To begin, Plaintiffs are unlikely to succeed on the merits because they have not identified a single case in which a court has invalidated a mail inspection policy similar to that of BFDF on constitutional grounds. Indeed, courts have repeatedly found that similar policies in which prisons open, inspect, photocopy, and discard or withhold legal mail do not violate the First Amendment if done in the presence of the inmates. *See Bray v. Mazza*, No. 4:21-CV-00119-JHM, 2022 WL 17836601, at *4 (W.D. Ky. Dec. 21, 2022) (inspection policy involving "opening, copying, providing the inmate a photocopy of the legal mail, and withholding or discarding of the original legal mail," did not violate the First Amendment); *Levine v. Bradshaw*, No. 22-80321-CIV, 2023 WL 11885182, at *1, 5-8 (S.D. Fla. July 6, 2023) (upholding mail inspection policy where facility would in the inmates' presence "inspect an inmate's privileged mail for contraband, … make a photocopy of the original legal correspondence along with the envelope in which the correspondence was sent, … provide the inmate with the photocopies and shred the original

[3] The R&R concluded that Plaintiffs were entitled to preliminary injunctive relief on their APA claim based solely on the finding that they are substantially likely to prevail on their First Amendment claim. R&R at 15-27, 34. Accordingly, the Government will not address Plaintiffs' motion for a preliminary injunction on their APA claim, other than to note that it should be denied because, for the reasons explained herein, Plaintiffs have failed to show any likelihood of success on the merits of their First Amendment claim.

documents").

The R&R nevertheless concluded that the "BFDF staff [practice of] retaining the original legal mail in a property bin outside of the detainee's control creates a sufficient risk of chilling the free flow of communication between a detainee and their attorney as to potentially violate the First Amendment." R&R at 17. But, the three cases on which the R&R relied are inapposite, as the plaintiffs in those cases put forth allegations from which it could be reasonably inferred that the legal mail could be accessed and read by prison staff or contractors outside of the inmates' presence, and the courts merely held that the allegations were sufficiently plausible to survive motions to dismiss. *See Christmas v. Nabors*, 76 F.4th 1320, 1327-29 (11th Cir. 2023) (inmate stated plausible First Amendment claim by alleging that prison staff "made [inmate] open his legal mail in their presence and scan it into a computer that allegedly contains 'a memory chip'" that "stores a prisoner's mail and … enables jail officials to access a prisoner's mail outside his presence"); *Thompson v. Ferguson*, 2020 WL7872629, at *3 (E.D. Pa. Dec. 31, 2020) (plaintiff stated plausible First Amendment claim where "original [legal] mail was to be deposited into a locked and secured receptacle provided by a vendor" working on behalf of the prison who was deemed to be a state actor, "only the vendor was to be able to unlock or access the receptacle," and "vendor was to securely maintain [it]… for 45 days and then securely destroy [it]"); *Walker v. Little*, No. 20 Civ. 4460, 2022 WL 580641, at *8 (E.D. Pa. Feb. 24, 2022) (plaintiff challenging same policy as at issue in *Thompson* plausibly alleged First Amendment violation).

Here, by contrast, it cannot be reasonably inferred that BFDF staff would access and read detainee legal mail outside of the detainees' presence. Pursuant to the BFDF mail inspection policy, original legal documents are sealed in property bins in the detainees' presence, the property bins cannot be opened outside the detainees' presence, and numbered seals are issued each time

the property bins are opened and original legal mail is added. Harvey Decl. ¶¶ 12-14, Ex. C; PBNDS §5.1(V)(F). And, contrary to the R&R's conclusion that BFDF detainees did not have access to the original legal documents secured in their property bins, R&R at 6, BFDF did permit them access to these documents, when necessary, such as to obtain original signatures or documents with raised stamps. Jankauskas Decl. Ex. 2; *see also* Harvey Decl. ¶ 25. Although Mr. Valdez claims that BFDF did not secure his original legal mail in his property bin in front of him, and that they denied him access to his property bin, (ECF No. 39, ¶ 12), this a most creates an issue of fact precluding a preliminary injunction at this time. *See Kern v. Clark*, 331 F.3d 9, 12 (2d Cir. 2003) ("Factual disputes necessitate [ ] an evidentiary hearing" before deciding a preliminary injunction.") (citation omitted)). In any event, as the *Thompson* court observed, alleging a plausible First Amendment claim "is not the end of the inquiry" as the "policy could still be constitutional if it is reasonably related to legitimate penological interests" pursuant to *Turner v. Safley* 482 U.S. 78 (1987), which "is a highly fact-intensive inquiry." *See Thompson*, 2020 WL7872629 at *9 (citations omitted).

The R&R's conclusion that Plaintiffs are likely to succeed in proving that the BFDF mail inspection policy is not "reasonably related to legitimate penological interests" under the *Turner* analysis is likewise erroneous. In *Turner*, the Supreme Court identified four factors that courts may consider when assessing the reasonableness of a facility's policy: "(1) whether there is a 'valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it'"; (2) "whether 'alternative means' of exercising the 'right remain open to prison inmates'"; (3) "what 'impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally'"; and (4) "whether any 'obvious, easy alternatives' to the current regulation exist, which would suggest that

the policy is an 'exaggerated response to prison concerns.'" *Rodriguez v. Burnside*, 38 F.4th 1324, 1329 (11th Cir. 2022) (quoting *Turner*, 482 U.S. at 89–91). The Court does "not balance these factors to see if some outweigh the others." *Id.* (citing *Beard v. Banks*, 548 U.S. 521, 532–33 (2006)). "The last three factors are valuable because they provide more angles from which to view the fundamental inquiry: whether the prison regulation is reasonably related to legitimate penological interests." *Id.* "If that rational connection is missing, 'the regulation fails, irrespective of whether the other factors tilt in its favor.'" *Id.* (quoting *Shaw v. Murphy*, 532 U.S. 223, 229–30 (2001)). "And if the connection exists, the policy will stand." *Id.* (quoting *Beard*, 548 U.S. at 533). Plaintiffs "bear [] the burden of establishing the unconstitutionality of the [challenged] policy." *Levine*, 2023 WL 11885182 at *6 (citing *Pesci v. Budz*, 935 F.3d 1159, 1166 (11th Cir. 2019)). Contrary to the R&R's conclusion, Plaintiffs fail to discharge this burden.

As to the first factor, the R&R correctly acknowledged that [p]reventing drugs and other illicit substances from entering a detention facility and ensuring the safety of both detainees and staff is unquestionably a legitimate government objective," R&R at 23, but incorrectly concluded that the BFDF practice of securing original legal mail in the detainees' property bins was not rationally connected to that objective, *Id.* at 24-25. The R&R reasoned that the Government failed to show "why BFDF must retain copies of all legal mail, regardless of whether contraband is discovered," and why BFDF must "apply[] … the … Policy to documents provided by a legal representative during an in-person visit, given the lack of evidence of contraband entering the facility through that means." *Id.* The R&R is wrong on both counts.

As noted above, the courts in *Bray* and *Levine* held that policies involving copying and destroying all original legal mail, regardless of whether contraband was detected, were reasonably related to the same legitimate objective presented here. *See Bray*, 2022 WL 17836601, at *4;

*Levine*, 2023 WL 11885182, at *5-8. As explained in *Levine*, "allow[ing] inmates to keep certain original documents would … bring about … [a]potential compromise of the Jail's institutional security" and "introduce the specific risk to prison safety and security that the policy sought to prevent." *Levine*, 2023 WL 11885182, at *7 (quoting *Rodriguez*, 38 F.4th at 1333). So too here. The Government has presented evidence that instances of drugs and synthetic substances entering BFDF dropped after the November 2023 policy was implemented, but then increased again after BFDF started retaining original legal mail in detainee property bins only when contraband was detected by a scanner that is not 100% effective. Harvey Decl., ¶¶ 17-23. While a BFDF investigation found that contraband had entered the facility through detainees bringing documents back from court, *id.* ¶ 23, there was no finding that this was the only means by which contraband could have entered the facility. Accordingly, returning to the practice of retaining legal mail only when contraband is detected by a less than 100% effective scanner would only serve to increase the risk of contraband entering the facility and endanger the health and safety of BFDF detainees and staff. While the R&R surmises that BFDF could simply destroy the original legal mail after copying it, this would deprive detainees of original legal documents they may need for their cases. (ECF No. 41, Ex.2).

The R&R's conclusion that BFDF should not have applied the November 2024 policy to original documents detainees receive during legal visits without evidence that contraband had entered the facility that way is likewise misplaced. Critically, attorneys have been known to unwittingly introduce drug-tainted documents into jails, including in the Buffalo area. *See* Harvey Decl., Ex. H (January 28, 2024 Buffalo News article entitled "The daunting battle to keep deadly drugs out of Erie County jails") (noting that "some lawyers began unwittingly bringing contraband into the jails" when "family members would ask lawyers representing detainees to carry documents

for them, saying they had papers that their loved ones should review to aid their legal defense. But some pages would be laced with synthetic drugs."); *see also Levine,* 2023 WL 11885182 at *2 (upholding policy in which facility provided photocopies of all documents to inmates where an attorney "brought in suspicious documents saturated with cocaine"). Moreover, BFDF found that contraband had entered the facility through documents exchanged during court, Harvey Decl. ¶ 23, where detainees presumably were accompanied by counsel. As suspected drug overdoses and hospitalizations were resulting from drug tainted-documents entering the facility, and contraband unknowingly given to detainees during legal visits was a possible cause, BFDF's decision to extend the policy to these documents was reasonably connected to the objective of keeping contraband out of the facility.

As to the second factor, the R&R improperly credited Plaintiffs' claims that BFDF's mail inspection policy has prevented them from communicating in writing with clients detained at BFDF and that they lack an alternative means of exercising their First Amendment rights to communicate with them. Because the policy allows detainees to receive copies of their legal mail and does not apply to outgoing mail, the policy "does not prevent inmates from exchanging privileged correspondence with their attorneys; it merely prevents inmates from possessing or having access to original documents of any kind, regardless of any privilege that may attach to the documents themselves". *Levine,* 2023 WL 11885182 at *7. Nor does the mail policy prevent Plaintiffs from communicating with their clients by phone or in person at BFDF.

To be sure, Plaintiffs say that they stopped communicating in writing with an unspecified number of unidentified clients detained at BFDF, and Mr. Valdez attests that he directed his attorneys to stop communicating with him in writing, all out of professed concern that BFDF staff would improperly access and read these communications. (ECF Nos. 38, 39, 40). But these

alleged concerns are premised upon speculation, not reliable evidence. As noted above, neither of the attorney declarants purport to have personal knowledge of BFDF employees or contractors improperly accessing or reading legal mail. Mr. Valdez baldly states that he has seen BFDF staff read, not his own, but other unidentified detainees' legal mail during copying, but provides no information about how he would even know that BFDF staff were actually reading original legal documents, as opposed to performing a visual inspection for contraband. (ECF No. 39 ¶ 14). The absence of any complaints from the detainees whose legal mail BFDF staff allegedly read suggests that nothing improper occurred. And while Mr. Valdez also states that he once could not witness BFDF staff secure his original legal mail in his property bin, *id.* at ¶ 12, it does not follow that BFDF staff must have improperly read his original legal mail. As explained above, this is contrary to the policy. There is simply no evidence that any BFDF staff improperly accessed detainees' property bins. Moreover, the claim of a single detainee that BFDF staff mishandled his legal mail does not suggest a pattern or practice of BFDF staff improperly accessing legal mail. *See Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) ("an isolated incident of mail tampering is usually insufficient to establish a constitutional violation"; "the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail.") Thus, there is insufficient evidence to reasonably conclude that BFDF's policy would interfere with Plaintiffs' ability to communicate confidentially with their clients, let alone that it actually has done so. At most, Mr. Valdez's claim raises a factual dispute on this issue precluding a preliminary injunction.

Turning to the third factor, in finding that it favors Plaintiffs, the R&R noted that the Government "put forth no argument that accommodating Plaintiffs' constitutional rights will have an impact on other inmates, guards, or the facility generally." R&R at 26. Yet, as noted above, an evident impact of requiring BFDF to return to the March through November 2024 status quo,

when a less than 100% effective scanner was used to detect contraband, is an increased risk that drugs and other illicit substances will find their way into the facility and endanger the health and safety of detainees and staff alike.

As to the fourth *Turner* factor, the R&R posits that there is a readily available alternative to the BFDF mail inspection policy; namely that "where no contraband is detected, BFDF can copy the original legal mail in the detainee's presence, provide a copy to the detainee, and destroy the original legal mail." R&R at 27. It is true that BFDF could elect to shred original legal mail rather than secure it in detainee property bins, but as noted above, to do so would deprive detainees of original documents they may need for their cases and invite grievances and litigation from detainees that the facility has improperly destroyed original legal documentation needed for their cases. Accordingly, Plaintiffs have failed to identify obvious, easy alternatives to the current policy to suggest that it is an exaggerated response to prison concerns.

In sum, Plaintiffs have failed to offer evidence establishing that they are likely to succeed in proving a First Amendment violation pursuant to the highly fact-intensive *Turner* analysis.

### B. The R&R Incorrectly Concluded That Plaintiffs Made a Strong Showing of Irreparable Harm

The Court should also reject the R&R's finding that Plaintiffs have established that they will suffer irreparable harm absent a preliminary injunction. As an initial matter, while the R&R observes that irreparable harm may be presumed where the plaintiff shows they are likely to succeed on a First Amendment claim, R&R at 15, Plaintiffs have not shown that they are likely to succeed on the merits for the reasons discussed above. Regardless, the R&R incorrectly concludes that Plaintiffs have shown that BFDF's mail inspection policy causes actual irreparable harm by interfering with Plaintiffs' right to freely communicate confidentially with their clients. As explained above, Plaintiffs have failed to present evidence demonstrating a risk that BFDF staff

would improperly access detainee property bins and read legal mail in violation of the policy, let alone that any BFDF staff has in fact done so. At most, there is a dispute of fact on this issue precluding any finding of irreparable harm at this time.

Moreover, Plaintiffs' lengthy delay in seeking injunctive relief further undermines their theory of irreparable harm, *see* Defs. Opp. (ECF No. 45) at 10-13, and the R&R erred in finding otherwise. First, the R&R incorrectly determined that most of Plaintiffs' delay was "adequately explained." R&R at 30. As the R&R acknowledged, BFDF first implemented a policy involving the opening, copying, and storage of detainee legal mail in November 2023—over eighteen months before Plaintiffs filed their request for injunctive relief. *Id.* 29. The R&R then incorrectly concluded, however, that Plaintiffs "perhaps" did not immediately challenge the November 2023 Policy because it was "intended to be a temporary measure." *Id.* This conclusion is unsupported by the record and is purely speculative, as Plaintiffs did not make this argument in their briefing or state as such in their declarations. *See generally* Pls. Opening Brief; Pls. Reply. Similarly, the R&R erroneously concluded that Plaintiffs adequately explained the two-and-a-half-month delay between their filing of the complaint and their request for injunctive relief. R&R at 30-32. While Plaintiffs claim that they were engaging in settlement discussions with the Government, any such discussions occurred after they filed their Complaint, when they were allegedly experiencing irreparable harm. The Government never requested that Plaintiffs refrain from seeking any injunctive relief. That Plaintiffs did not pursue this relief while simultaneously discussing settlement is at odds with their claim that they were being irreparably harmed by BFDF's mail policy.

Accordingly, the R&R failed to adequately weigh the length of Plaintiffs' delay when determining whether they had established irreparable harm. Plaintiffs' delay—eighteen months in

total—underscores that their harms are not so immediate as to warrant injunctive relief. *See Huminski v. Rutland City Police Dep't*, 221 F.3d 357, 360-61 (2d Cir. 2000) (plaintiff's delay is relevant when analyzing claim of irreparable harm, even where plaintiff's irreparable injury would be presumed because there was a likely First Amendment violation). The Court should therefore reject the R&R's conclusion that Plaintiffs have shown irreparable harm.

### C. The R&R Incorrectly Concluded That the Balance of Hardships and Public Interest Weigh in Favor of Granting a Preliminary Injunction

Finally, the R&R erred in concluding that the balance of hardships and public interest weigh in favor of granting preliminary injunctive relief, observing that the harm from alleged constitutional violations outweighs agency financial or administrative burdens, and that protecting constitutional rights is in the public interest. R&R at 33. Plaintiffs cannot show that the balance of hardships and public interest weigh in their favor because they failed to satisfy the first two factors for the reasons explained above. *See Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) ("[I]t is clear [plaintiffs] cannot make the corresponding strong showings [on the second two factors after failing to satisfy the first two]").

Furthermore, while Plaintiffs do allege a constitutional violation, the countervailing harm at issue here is not financial or administrative burdens. Rather, as explained above, BFDF's mail inspection policy was implemented to protect the health and safety of BFDF detainees and staff from drugs and other synthetic substances. The policy prevents contraband from circulating within the facility, while preserving detainees' ability to communicate confidentially with their attorneys and retain any original documentation necessary for their cases. The R&R acknowledges that "[t]he right to free speech is not absolute[,]" that "the attorney-client privilege [likewise is not] absolute[,]" and that "deference [is]afforded prison officials in administering the day-to-day operation of a prison." R&R at 37, 39 (internal quotations and citations omitted)). These principles

compel the conclusion that the balance of hardships and public interest weigh decidedly in favor of denying a preliminary injunction here.

## CONCLUSION

For the foregoing reasons, the Court should (1) stay consideration of the preliminary injunction motion and rule on the Government's motion to transfer venue, or alternatively, (2) deny Plaintiffs' motion for a preliminary injunction.[4]

Dated: August 22, 2025

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: *s/ Pierre G. Armand*
PIERRE G. ARMAND
REBECCA L. SALK
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2800

[4] In accordance with Fed. R. Civ. P. 65(c) and the President's March 11, 2025, memorandum titled "Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)," if the Court enters a preliminary injunction, defendants respectfully request that the Court require plaintiffs to post a bond of $10,000. *See* Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."); www.whitehouse.gov/presidential[1]actions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/.

## Certificate of Compliance

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules. As measured by the word processing system used to prepare it, this memorandum contains 7,810 words.